IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 5, 2013

**IN RE: SAHARA W.**

**Appeal from the Juvenile Court for Knox County**
**No. 90266      Tim Irwin, Judge**

**No. E2013-00510-COA-R3-PT-FILED-SEPTEMBER 24, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition in the
Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate the parental
rights of Jasmine W. ("Mother") to the minor child Sahara W. ("the Child").  A new
permanency plan was approved following the filing of the petition.  After a trial, the Juvenile
Court entered an order finding and holding, *inter alia*, that clear and convincing evidence had
been proven that grounds existed to terminate Mother's parental rights under Tenn. Code
Ann. § 36-1-113 (g)(2) and (g)(3), and that termination of Mother's parental rights was in
the Child's best interest.  Mother appeals the termination of her parental rights, arguing that
she was not properly notified of being at risk of losing her parental rights because the new
permanency plan was approved after the filing of the petition.  We hold that Mother
sufficiently was put on notice that her parental rights were subject to being terminated at trial.
We affirm the judgment of the Juvenile Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY
and THOMAS R. FRIERSON, II, JJ., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Jasmine W.

Robert E. Cooper, Jr., Attorney General and Reporter; and, Alexander S. Rieger, Assistant
Attorney General, for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in August 2009. At that time, Mother, a minor herself, was living with her grandparents in their home. In June 2011, the Child's guardian ad litem filed an emergency petition for temporary legal custody and restraining order in the Juvenile Court, alleging that Mother's anger management issues placed the Child at risk. By agreed order, the Juvenile Court declared the Child dependant and neglected. In July 2011, DCS created a permanency plan for Mother. The plan required Mother to do numerous things, including: obtain suitable housing, obtain a legal income, participate in counseling, and complete a parenting class. In April 2012, DCS created a second permanency plan for Mother. With respect to this second plan, the Juvenile Court entered an order stating:

> The proposed permanency plan (aka permanency goal) for this child is Return to Parent or Exit Custody with Relative and those concurrent goals are not appropriate or in the child's best interest given the mother's lack of progress and the absence of any currently identified and active relative resource. The Court directs that the goals be changed to concurrent planning for Return to Parent or Adoption and that the Department of Children's Services take immediate steps to achieve permanency for this child.

In August 2012, DCS filed a petition seeking to terminate Mother's parental rights to the Child, alleging abandonment, substantial noncompliance with permanency plan, and persistent conditions. In August 2012, yet a third permanency plan was created for Mother. This third plan was substantially similar to the first two plans. The third plan stated: "[The Child] has been in the Department's custody since June of 2011 and is in need of permanency." The plan went on to state "[The Child] will exit custody with a family that can meet her needs and provide permanency for the child." One component in the plan was: "DCS will hold a CFTM to identify best family for child and make final [selection] of pre-adoptive family." This matter was tried over the course of two days in February 2013.

Leigh Anne Goldstine ("Goldstine"), a clinical manager with Foothills Care, testified. Goldstine was stipulated as an expert. Goldstine testified that the Child is bonding well with her current foster family and refers to the adults as "mommy" and "daddy." According to Goldstine, the Child would suffer emotional trauma were she to move again. Goldstine also testified to Mother's behavior around the Child. Goldstine based her opinions on a number of visits between Mother and the Child. Mother often was anxious around the Child, and did not react well to suggestions from Goldstine. Goldstine stated that Mother "was often very upset and angry with me, yelling, asking me not to be in the room, asking

me not to give her instruction . . . ." Goldstine testified that Mother is unable to appropriately parent the Child.

Deb Tracy ("Tracy"), a family intervention specialist with Foothills Care, testified. Tracy conducted therapeutic visitation with Mother and the Child. Tracy stated that she did not observe much nurturance from Mother to the Child. Tracy further testified that Mother became agitated when Tracy offered suggestions on things to do with the Child. Tracy testified that she witnessed Mother's anger issues.

Victoria Bentley ("Bentley"), a family intervention worker with Foothills Care, testified about her involvement in the case. Bentley testified to Mother's anger issues:

> Like one of the things, she would probe [the Child] to argue with her. Like she would yell at her, and she would just encourage the child to argue with her. And then there was times when she was very confrontational with her grandmother. You know, we discussed how [the Child] is absorbing her environment. That behavior would be something that [the Child] would pick up on.

Bentley also stated that Mother was resistant to suggestions about creating objectives for the Child, and that Mother "didn't agree with parenting." Bentley's services in the case ended in September 2011.

DCS case manager Marquita Andrew ("Andrew") testified. Andrew assisted in the creation of the first permanency plan, and had frequent contact with Mother. Andrew testified that although Mother has obtained housing, she has continued to have problems in other areas. Andrew stated that Mother has not demonstrated any learned skills and has not completed parenting education. Mother had no legal source of income, according to Andrew. Mother also continued to have anger issues. Andrew acknowledged that Mother was working on her GED. Andrew described Mother's behavior:

> Some days [Mother] is argumentative, crying, yelling, screaming, pitching a fit, instigating the child, instigating - - trying to instigate me as a worker, trying to instigate people around her. Some days she comes in mad; some days she doesn't. There's a lot of anxiety issues. If she comes into the visitation anxious, that tone continues with that visit to the point that - - you know, she's even had arguments with people out in the lobby . . . .

The following exchange occurred on the subject of whether Mother had progressed:

Q: Now, I'm sure we've all heard this more than  - - I'm going to ask you to say it one more time.  With all of the efforts the Department has made, multiple service providers in place and even multiple professionals within individual service providers, any improvement, any glimmer of hope in the mom's ability to parent safely and effectively [the Child]?

A:  Let me answer it this way: [Mother] asked me to let the Court know that she loves her child.  But as far as her ability to parent anyone, it also stems from the ability to take care of herself.  And we are now to the point not where she can't take care of herself, but she won't, much less anyone else.

One "Miss Linda[1]" testified.  Miss Linda was the Child's foster mother.  The Child had lived with Miss Linda since January 2012.  Miss Linda's family consisted of her husband, an 18 year old son, a 15 year old son, a 10 year old daughter, and a one year old son.  Miss Linda stated that she was prepared to adopt the Child.  Miss Linda testified that the Child had no medical problems and was developmentally on target.  Miss Linda stated that the Child got along well with her other children.

Gary S., the Child's great-grandfather and former foster father, testified. Gary S. testified that he was willing to adopt the Child.  Gary S. and his wife previously had served as foster parents to the Child.  However, conflicts with Mother scuttled that arrangement.  Gary S. testified that "[i]t was just too much," although he believed things would go better this time around were he to obtain custody of the Child.

Mother, 19, testified that she was 15 when she gave birth to the Child.  Mother was still a minor when the Child was removed from her home.  For income, Mother stated that her grandmother helps her.  Also, Mother is enrolled in a program called CSEP which helps the participant locate a job and receive training.  Mother acknowledged making some mistakes, but testified that she was improving.  Mother had enrolled in Pellissippi State Community College.  Mother stated that she now had an apartment, and had made preparations for the Child to live there.

In its February 2013 order, the Juvenile Court terminated Mother's parental rights to the Child on the grounds of substantial noncompliance with permanency plan and

---

[1]The foster mother's name was withheld, and she testified simply as "Miss Linda."

persistent conditions.[2] The Juvenile Court also found that it was in the Child's best interest for Mother's parental rights to be terminated. We reproduce the detailed order in part:

9. Respondent frankly admitted that she has not complied with the responsibilities established on the various permanency plans. She testified that she was wrong for not doing what she was supposed to do and that she should have complied sooner. She stated that after an altercation with her mother at the end of last year she recognized that she had made mistakes and that she now realizes she needs to make changes. She has received services through Peninsula, Cherokee, Foothills Care, Child & Family Services, Helen Ross McNabb, and Complete Counseling North to address mental health, anger management, and parenting/bonding issues. In each instance she participated briefly and then quit.

10. Respondent testified that she plans to start alcohol and drug treatment on the Wednesday following this hearing. She has completed two parenting classes. She is back on psychotropic medication, taking Fluoxetine (generic Prozac) to address depression, mood swings, and bipolar disorder and believes it is making a difference. She claims she has been compliant with medication for three months although when she was drug-screened by the child's case manager on January 23, 2013, she said she was taking anything other than a steroid she had gotten from the hospital. She was positive for marijuana on that date and said she knew she would be and she wasn't worried about it because marijuana isn't a drug. She acknowledged that remark during her testimony and said that just showed she needs substance abuse treatment. She was supposed to begin anger management classes on the Monday before this hearing but didn't get there because her grandmother was not available to take her; she now plans to begin next Monday. She went to Peninsula for an intake on December 7, 2012, where she reported she was there because "DCS is requiring her to complete 'anger management classes at the Lighthouse and get a certificate if I want to get my daughter back." On that date she presented as easily irritable, admitting that she gets angry "at little stuff and big stuff, sometimes gets into fights, sometimes breaks things, poor sleep, emotionally detached from others, don't care what I say, I tell my little girl to shut up and I don't mean to say that . . ." Eventually her anger shifted into tearfulness. She returned on December 13, 2012, more than twenty minutes late, and was hostile during the entire session. She was mad that she had to get up early to

_____

[2]While failure to support was a ground in the petition to terminate parental rights, the Juvenile Court notes "[f]urther evaluation of this issue is not necessary as counsel for the Department of Children's Services withdrew abandonment by failure to pay support as a ground for termination."

come to the appointment, indicated she would seek services elsewhere, and refused referrals to any other agency.

11. Respondent has a subsidized apartment with her child's name on the lease. She lives there rent-free in exchange for community service hours. She has a bedroom for [the Child] and has decorated it with a white bedroom suite and Tinkerbell furnishings. She reported that she gets credit for being "enrolled" in school, despite having walked out of class in October after one week. She relies on financial support from her maternal grandmother. She was given a pamphlet for CSEPP at her child support hearing in mid-January and is scheduled to attend orientation at 12:30 pm next Wednesday (the same time she is supposed to start substance abuse treatment). She has been making progress toward obtaining a GED, something she has been working on since she was a minor before this Court. She testified that she never took it seriously before; that she got in trouble and stopped going a bunch of times. Last October the teacher made her angry and she walked out after just a week. She later passed three of five sections on her own. She started back in classes this week and will be meeting with a counselor (whose name she did not know) next week.

12. Upon these facts, the Court finds that Respondent has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plans related to remedying the conditions which necessitate foster care placement. She made some attempts but very little progress. She now has a place to [live] and at least showed up for a hearing in the Child Support Division of this Court. She started but never really finished anything else and she had not demonstrated any learned parenting skills or techniques.

13. The Court further finds that the child has been removed by order of this Court for a period of six (6) months; the conditions which led to her removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of Respondent; there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to Respondent in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home. There really is not a whole lot of difference in Respondent's circumstances other than acquisition of an independent apartment.

***

1. Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. She has been offered services through multiple agencies, including three specialists from Foothills Care, each of whom testified that she had made no progress in implementing what they were trying to teach. She has maintained regular visitation or other contact with the child but that visitation has been illustrative of her inability to parent. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional and psychological condition as evidenced by the recent bonding assessment. She is using marijuana, but not other drugs, and admits that she needs substance abuse treatment to address this use. Respondent's mental and/or emotional status would be detrimental to the child or prevent Respondent from effectively providing safe and stable care and supervision for the child. The key words here are safe and stable. She is fighting a day to day battle to care for herself. And she has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services . . . .

\*\*\*

6. While relatives have a statutory preference for placement, the Court of Appeals has held repeatedly that the trial courts may consider relative preference as a factor in the best interest determination of the child, after the initial period it is not a controlling factor. To the contrary, the best interest of the child remains the paramount and utmost consideration. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. And continuity of placement is the most important factor when determining what is in the children's best interest. [Gary S.] and [Diane S.] were considered for placement when the child entered foster care. She was placed with them. They asked that she be moved. She has now been in a foster home for more than one year. That home has provided her with continuity, is clearly meeting her needs, and has acquired a statutory preference for adoption.

7. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

8. It is, therefore, in the best interest of [the Child] and the public that all of Respondent's parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of

Tennessee, Department of Children's Services, with the right to place her for adoption and to consent to such adoption <u>in loco parentis</u>.

Mother timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred in terminating Mother's parental rights to the Child when a new permanency plan was entered after DCS filed its petition to terminate Mother's parental rights. Mother does not address the grounds found to exist for termination of her parental rights to the Child or that termination was in the Child's best interest. Nevertheless, we will review these issues.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)).

-8-

> "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).
>
> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

As pertinent to this appeal, Tenn. Code Ann. § 36-1-113 (g) provides the following as grounds for termination of parental rights:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> ***
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

-9-

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

  (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

  (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

  (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113 (g) (Supp. 2013).

We first address whether the Juvenile Court erred in terminating Mother's parental rights to the Child when a new permanency plan was entered after DCS filed its petition to terminate Mother's parental rights. Mother argues that she was not properly notified of the jeopardy to her parental rights.

Following the filing of the petition to terminate Mother's parental rights in August 2012, a third permanency plan was created and approved. One of the stated goals of the plan was that "[the Child] will exit custody with a family that can meet her needs and provide permanency for the child." This feature of the third permanency plan clearly shows that Mother's parental rights were in peril. Indeed, the filing of the petition to terminate parental rights also served as such indication. At the onset of trial in this case, Mother's attorney requested a continuance on the basis that Mother was in the process of completing her GED. This occurred after the Juvenile Court expressly explained that the forthcoming trial was to be about termination of Mother's parental rights. No one contested this characterization of the proceedings. These facts do not indicate that anyone was confused or uncertain as to the purpose of the hearing. Indeed, at one point in her testimony, Mother was asked "if you didn't do what was on your plan, that you would be giving the Department grounds for termination?," to which she replied, "That's why we're here."

Finally, DCS notes that Mother failed to raise this argument before the Juvenile Court and that, therefore, the issue should be waived. We do not agree with this argument.

Nevertheless, the fact that Mother failed to raise this issue previously is relevant as to whether she had notice her parental rights were at risk. Since the Child was removed from Mother's care, this case has been a saga of efforts to get Mother to fulfill certain goals such that she could effectively parent the Child. From the time of the second permanency plan, the specter of termination of Mother's parental rights clearly has existed and was known by everyone involved in this case.

Mother invokes the case of *In re C. A. H.*, No. M2008-00005-COA-R3-PT, 2008 WL 3068430 (Tenn. Ct. App. Aug. 1, 2008), *no appl. perm. appeal filed*. In *In re C. A. H.*, we, among other things, reversed the trial court on two grounds of termination of parental rights because we found that the Department had failed to show that it made reasonable efforts to make it possible for the children at issue to return home. *Id*. at *10. We find this case to be inapposite, not least because reasonable efforts are not at issue in this appeal. The totality of the record in this case reflects that Mother sufficiently was put on notice that her parental rights were subject to being terminated at trial. We affirm the Juvenile Court as to this issue.

We next address whether the Juvenile Court erred in erred in finding and holding that the ground of substantial noncompliance with permanency plan existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(2). From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of substantial noncompliance with permanency plan are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(2).

We next address whether the Juvenile Court erred in erred in finding and holding that the ground of persistent conditions existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(3). From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of persistent conditions are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(3).

We next address whether the Juvenile Court erred in finding and holding that it was in the Child's best interest for Mother's parental rights to be terminated. The relevant statutory provision is Tenn. Code Ann. § 36-1-113 (i), which provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (Supp. 2013).

The Juvenile Court conducted a best interests analysis as set forth above, and we find no basis to overturn the findings of the Juvenile Court as relevant to this issue. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding made by clear and convincing evidence that it is in the Child's best interest for Mother's parental rights to be terminated. We affirm the Juvenile Court's finding that it is in the best interest of the Child for Mother's parental rights to be terminated.

We affirm the judgment of the Juvenile Court in its entirety.

### Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Jasmine W., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE